## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SELECT SPECIALTY HOSPITAL - TULSA/
MIDTOWN, LLC D/B/A SELECT SPECIALTY
HOSPITAL - TULSA MIDTOWN formerly known as
AHS HILLCREST SPECIALTY HOSPITAL, LLC
D/B/A HILLCREST SPECIALTY HOSPITAL
1125 South Trenton, 2nd and 3rd Floors
Tulsa, OK 74120,

        Plaintiff,

      v.

ALEX M. AZAR II, Secretary
United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201,

        Defendant.

Civil Action No. 1:18-cv-584

## COMPLAINT FOR REVIEW OF AGENCY ACTION

### INTRODUCTION

1.    This case is about unpaid Medicare cost-sharing amounts ("bad debts") for patients at Plaintiff's hospital who were eligible for both Medicare and Medicaid ("dual eligible beneficiaries" or "dual eligibles").  The Defendant's fiscal intermediary denied these bad debt amounts on Plaintiff's annual Medicare cost reports, despite the fact that the Plaintiff was unable to provide the *only* document the fiscal intermediary would accept—a remittance advice ("RA") from the state Medicaid program showing that the Plaintiff billed Medicaid for the bad debt amount, the Medicaid claim was processed, and a payment determination was made by the state. The Plaintiff cannot obtain Medicaid RAs because it was not enrolled or otherwise participating in the state Medicaid program at the time the services were rendered, and the states have no other

mechanism to process bills from such a health care provider ("provider").  In one of the two

states at issue—its home state of Oklahoma—the Plaintiff *could not* enroll in Medicaid because,

as a long-term care hospital ("LTCH" or "LTAC"), it is not a recognized provider type.

2.     The fiscal intermediary previously understood this and reimbursed the Plaintiff

for dual eligible bad debts without Medicaid RAs.  The Plaintiff relied on this practice of

allowing dual eligible bad debts without Medicaid RAs when the Plaintiff admitted or continued

to treat dual eligible beneficiaries during these years.  However, the fiscal intermediary abruptly

began denying the bad debts at issue here, without formal notice, by applying the so-called "must

bill" policy of the Defendant's Centers for Medicare & Medicaid Services ("CMS").  When the

fiscal intermediary changed how it applied the must bill policy with respect to the Plaintiff, it

made it *impossible* for the Plaintiff to comply.

3.     This Court previously determined that this situation creates a "classic Catch-22"

because the state Medicaid programs will not issue RAs in a form that CMS will accept and the

Medicare providers either are not enrolled in Medicaid or in some states *cannot* enroll in

Medicaid because, as LTCHs, they are not a recognized Medicaid provider type.  **Exhibit C** at

25, *Cove Associates Joint Venture d/b/a Life Care Center of Scottsdale and Select Specialty

Hospital-Denver et al. v. Sebelius*, 848 F. Supp. 2d 13 (D.D.C. 2012).  The fiscal intermediary

followed one policy and then around December 2008 imposed a different policy.  The first policy

exempted the Plaintiff from the must bill policy; the second policy imposed the must bill policy

on Plaintiff.  It was a complete reversal in the policy without prior notice, opportunity for

comment, or regard for the inability of the Plaintiff to comply.

4.     The fiscal intermediary's insistence on applying the must bill criteria under these

circumstances and insistence on a "valid" Medicaid RA as the only acceptable documentation to

allow dual eligible bad debts, even where states refuse to issue them, is inconsistent with prior audit treatment, was not preceded by notice to the Plaintiff of the change for non-Medicaid-participating providers, and amounts to a violation of the Medicare statute, 42 U.S.C. §§ 1395 *et seq.* (the "Medicare Act"), Medicare regulations and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*.  For these reasons, and the other reasons discussed herein, the fiscal intermediary's adjustments and denials of protested amounts for the Plaintiff's dual eligible bad debts are legally invalid and should be reversed.

5. The Plaintiff received a final agency decision from the Administrator of the Centers for Medicare & Medicaid Services ("Administrator") on January 17, 2018, pursuant to which the Plaintiff now files this Complaint.  The Administrator's decision is attached hereto as **Exhibit A**.  The Administrator modified a decision of the Provider Reimbursement Review Board ("PRRB" or "Board"), an entity within the Department of Health and Human Services ("HHS"), to reverse the portion of the PRRB decision that was favorable to the Plaintiff.  The PRRB's decision is attached hereto as **Exhibit B**.

6. As a result of the Defendant's Administrator decision, the Plaintiff's dual eligible bad debts are denied, decreasing the Plaintiff's Medicare reimbursement for inpatient services rendered by Plaintiff by approximately $568,803 total in its Medicare cost reporting periods ending in fiscal years ("FYs") 2007 and 2008.

7. By filing this Complaint, Plaintiff requests that the Court (i) reverse the Defendant's Administrator decision because it was invalid as a matter of law to apply the must bill policy to a non-Medicaid-participating health care provider and (ii) direct the Defendant to pay Plaintiff the amount of its outstanding bad debts for dual eligible beneficiaries, plus interest.

**JURISDICTION AND VENUE**

8.     This action arises under Title XVIII of the Social Security Act, as amended, 42

U.S.C. §§ 1395 *et seq.* (the "Medicare Act") and the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 551 *et seq.*

9.     Jurisdiction is proper under 42 U.S.C. § 1395oo(f).

10.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1) and 42

C.F.R. § 405.1877(e)(1).

11.     This Court has authority to grant the relief requested under 42 U.S.C. § 1395oo(f).

**PARTIES**

12.     Plaintiff Select Specialty Hospital - Tulsa/Midtown, LLC d/b/a Select Specialty

Hospital - Tulsa Midtown, formerly known as AHS Hillcrest Specialty Hospital, LLC d/b/a

Hillcrest Specialty Hospital, was a subsidiary of Ardent Health Services LLC ("Ardent"), and

operated a Medicare-certified LTCH (Medicare Provider No. 37-2007) in Tulsa, Oklahoma

during the years at issue.

13.     Defendant Alex Azar ("Secretary") is the Secretary of the United States

Department of Health and Human Services and is sued in his official capacity.  The Secretary is

responsible for the administration of the Medicare program.  The Secretary exercises the

administrative responsibility of the Medicare program primarily through CMS, an agency of

HHS.  The Secretary also contracts with private organizations to act as fiscal intermediaries (or

"FIs," but now called Medicare Administrative Contractors, or "MACs") for Part A of the

Medicare program.  Wisconsin Physicians Service Insurance Corporation ("WPS"), formerly

known as Mutual of Omaha, was the Medicare-contracted fiscal intermediary to the Plaintiff's

hospital during the relevant cost reporting periods.  The cost reports were subsequently

transitioned to Novitas Solutions, Inc. ("Novitas") when the MAC contract with CMS changed.

## MEDICARE PAYMENT FOR LONG-TERM CARE HOSPITAL SERVICES

14. The Medicare Act establishes a system of health insurance for the aged and the

disabled.  The program is administered in two parts: Medicare Part A, which provides hospital

insurance coverage to all qualified beneficiaries, and Medicare Part B, which provides medical

insurance coverage for services such as physician's services, outpatient services, and home

health care.  Participation under Part B is voluntary and beneficiaries must pay monthly

premiums.

15. Under Part A of the Medicare Act, an eligible Medicare beneficiary is entitled to

have payment made by the Medicare Program on his or her behalf for, *inter alia*, inpatient

hospital services provided to him or her by a hospital participating in the Medicare Program as a

"provider of services."

16. Pursuant to 42 U.S.C. § 1395cc, Plaintiff entered into a written agreement with

the Secretary to provide hospital services to eligible Medicare beneficiaries.  CMS, through its

fiscal intermediaries or MACs, pays hospitals participating in the Medicare program.  *See* 42

U.S.C. § 1395ww.  The amount of payment owed to a hospital for services furnished to Medicare

beneficiaries is determined by the fiscal intermediary or MAC acting as an agent of the

Secretary.  *See* 42 U.S.C. § 1395h.

17. The Medicare reimbursement system for LTCHs, the LTCH prospective payment

system ("LTCH PPS"), is based on different levels of cost than the system applicable to general

acute care hospitals, the inpatient hospital prospective payment system ("IPPS").  The Federal

standard rate has been much higher for LTCHs than for general acute care hospitals (*e.g.*,

$39,900 under the LTCH PPS in fiscal year 2010, compared to $5,500 under the IPPS in fiscal year 2010).

18.     Certain costs are excluded from the LTCH PPS and continue to be paid on the basis of reasonable cost, namely: bad debts, blood clotting factors, direct medical education, anesthesia services, and the cost of photocopying and mailing medical records requested by a Quality Improvement Organization.  *See* 42 C.F.R. § 412.521(b)(2).

## BAD DEBT AND REASONABLE COLLECTION EFFORTS

19.     Medicare does not cover the full cost of medical care.  Medicare beneficiaries are charged certain amounts for which they are liable.  For example, a Medicare beneficiary is charged a fixed deductible amount when he or she receives Medicare-covered inpatient services in a hospital for the first time in a benefit period (*see* 42 C.F.R. § 409.82), and is charged an inpatient co-insurance amount for each day after the first 60 days of an inpatient stay for a benefit period (*see* 42 C.F.R. § 409.83).

20.     Medicare regulations define "bad debts" as the "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services.  'Accounts receivable' and 'notes receivable' are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future."  42 C.F.R. § 413.89(b)(1).  These debts include any unpaid Medicare deductibles and coinsurance obligations.  *Id.* § 413.89(d).

21.     Medicare regulations entitle a hospital to reimbursement of these deductibles and co-insurance amounts by the Medicare program as "bad debts" if the hospital is not able to collect these amounts from the Medicare beneficiaries.  *See* 42 C.F.R. § 413.89.

22.     Medicare reimburses bad debts because the Medicare Act prohibits the shifting of

Medicare costs for which beneficiaries are responsible, to non-beneficiaries (*i.e.*, "cost shifting").

*See* 42 U.S.C. § 1395x(v)(1)(A).  The Medicare cost-shifting prohibition is specifically

addressed in the Medicare regulations governing bad debt, 42 C.F.R. § 413.89(d) ("Uncollected

revenue related to services furnished to beneficiaries of the program generally means the

provider has not recovered the cost of services covered by that revenue.  The failure of

beneficiaries to pay the deductible and coinsurance amounts could result in the related costs of

covered services being borne by other than Medicare beneficiaries.  To assure that such covered

service costs are not borne by others, the costs attributable to the deductible and coinsurance

amounts that remain unpaid are added to the Medicare share of allowable costs."); *see also*

Provider Reimbursement Manual (CMS-Pub. 15-1) ("PRM-I") § 304.

23.     Federal regulations establish certain criteria for "allowable" bad debt (*i.e.*, bad

debt that is reimbursable under Medicare) as follows: (1) the debt must be related to covered

services and derived from deductible and co-insurance amounts; (2) the provider must be able to

establish that reasonable collection efforts were made; (3) the debt was actually uncollectible

when claimed as worthless; and (4) sound business judgment established that there was no

likelihood of recovery at any time in the future.  *See* 42 C.F.R. § 413.80(e).  As long as the bad

debt meets these criteria, a health care provider is entitled to Medicare reimbursement for the

amounts.  *See* 42 C.F.R. § 413.89(d).

24.     A "reasonable collection effort" is defined as an effort similar to what a provider

would make to collect accounts receivable from a non-Medicare beneficiary.  *See* PRM-I § 310.

Generally, CMS presumes that "reasonable collection efforts" are exhausted, and that the debt is

uncollectible, if no payment has been received, the provider used reasonable and customary

efforts to bill the beneficiary for the cost-sharing amounts, and it has been at least 120 days since the first bill was issued.  PRM-I § 310.2.

25.     In 1987, Congress enacted a "bad debt moratorium" in response to proposed Medicare program changes.  *See* Omnibus Budget Reconciliation Act of 1987 ("OBRA '87"), Pub. L. No. 100-203 § 4008, 101 Stat. 1330-55, as amended by the Technical Miscellaneous Revenue Act of 1988 ("TMRA"), Pub. L. No. 100-647 § 8402, 102 Stat. 3798, and as further amended by the Omnibus Budget Reconciliation Act of 1989 ("OBRA '89"), Pub. L. No. 101-239 § 6023, 103 Stat. 2176 (codified as a note to 42 U.S.C. § 1395f (1992).

26.     As amended, the bad debt moratorium places two limitations on CMS' treatment of bad debt policy.  First, CMS cannot change its bad debt policy from the policy that was in effect on August 1, 1987.  Second, CMS cannot require a provider to change the bad debt procedures that provider had in place on August 1, 1987.

## COLLECTION EFFORTS FOR DUAL ELIGIBLE BENEFICIARIES AND THE MUST BILL POLICY

27.     Providers are excused from pursuing reasonable and customary collection efforts if they can establish that the beneficiary is indigent and that "no other source other than the beneficiary would be legally responsible for the beneficiary's medical bill" such as the state Medicaid program.  PRM-I § 312.

28.     Persons who are eligible for both Medicare and Medicaid benefits under their state Medicaid program (referred to herein as "dual eligible beneficiaries" or "dual eligibles") are generally deemed to be indigent.  *Id.*  With respect to ensuring that no other sources of payment are available, if the state Medicaid program has a legal obligation to pay all, or any part, of the Medicare cost-sharing amounts, the amounts are not considered to be allowable bad debts under Medicare.  *See* PRM-I § 322.

29.     Medicaid is a joint federal-state health insurance program that is administered by the states under plans approved by the federal government.  State Medicaid programs are subject to requirements under both federal and state laws and regulations.  Although state Medicaid programs are administered separately from Medicare, the Social Security Act requires them to pay Medicare cost-sharing amounts for poverty-level Medicare beneficiaries, although the state may impose a payment ceiling.  *See* 42 U.S.C. §§ 1396a(n), 1396d(p)(3).  However, in general, state Medicaid programs will only process and pay bills submitted by providers that participate in that Medicaid program after completing the state's enrollment process.

30.     CMS developed a policy through sub-regulatory guidance that the Medicare bad debt regulation at 42 C.F.R. § 413.89 requires providers to bill Medicaid in order to confirm that the state will not pay the Medicare cost-sharing amounts on behalf of the dual eligible beneficiary.  This has become known as CMS' must bill policy.

31.     Billing the state Medicaid program was not always required.  In fact, prior published instructions for filling out form HCFA-339 (Provider Cost Report Reimbursement Questionnaire) stated that, "it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment.  In lieu of billing the Medicaid program, the provider must furnish documentation of [Medicaid eligibility and non-payment that would have resulted from billing Medicaid]."  Plaintiff followed this documentation process and, when requested by the fiscal intermediary, furnished records of the patients' indigent status based on Medicaid eligibility in support of its bad debt claims.

32.     In 2004, CMS imposed additional requirements in connection with the must bill policy.  According to CMS, for a provider to be reimbursed for allowable bad debt, the provider

must bill the state Medicaid program and the state Medicaid program must process and refuse to pay the claim.  CMS requires that this refusal to pay must be in the form of a remittance advice (RA).  *See* CMS Joint Signature Memorandum ("JSM") 370 (Aug. 10, 2004).

### MEDICARE COST REPORTING AND APPEALS PROCESS

33.     Fiscal intermediaries make interim payments to providers, subject to subsequent adjustments.  *See* 42 U.S.C. § 1395h.

34.     At the close of its fiscal year, each Medicare provider must submit a "cost report" showing the operating and capital-related costs it incurred during the fiscal year and the appropriate portion of those costs to be allocated to Medicare.  *See* 42 C.F.R. §§ 413.24, 413.50.

35.     The fiscal intermediary is then required to analyze and audit the cost report and to inform the provider of the fiscal intermediary's final determination of the amount of the provider's Medicare reimbursement for that cost reporting period.  This final determination is known as the fiscal intermediary's Notice of Amount of Program Reimbursement ("NPR").  *See* 42 C.F.R. § 405.1803.

36.     If a provider is dissatisfied with its fiscal intermediary's final determination of its Medicare program reimbursement for a particular cost reporting period, and if the provider meets the requirements set forth in 42 U.S.C. § 1395oo(a), the provider may appeal the intermediary's determination or NPR to the Provider Reimbursement Review Board ("PRRB" or "Board").  *See* 42 U.S.C. § 1395oo(a)(1)(A)(i).

37.     The PRRB is a five member administrative tribunal that sits in Baltimore, Maryland and decides disputes between Medicare providers and their fiscal intermediary over the amount of reimbursement owed by the Medicare program for services rendered to Medicare patients.  *See generally* 42 U.S.C. § 1395oo.

38.     The PRRB has the power to affirm, modify or reverse any determination of a fiscal intermediary with respect to a cost report and to make any other modification on matters covered by the cost report.  *See* 42 C.F.R. § 405.1869.

39.     Following a hearing before the PRRB and its decision, the CMS Administrator may review the Board's decision and may elect to reverse, affirm, or modify the decision of the PRRB, or vacate that decision and remand to the PRRB for further proceedings.  *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875(e).

40.     The decision of the PRRB (or of the CMS Administrator if the Board's decision is reviewed by the Administrator) becomes the final determination of the Secretary, which is subject to judicial review pursuant to 42 U.S.C. § 1395oo(f) and 42 C.F.R. § 405.1877.

41.     Providers "have the right to obtain judicial review of any final decision of the Board, or any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received."  42 U.S.C. § 1395oo(f)(1).  This action can be brought in the United States District Court for the judicial district in which the provider is located, or alternatively in the United States District Court for the District of Columbia.

## FACTS SPECIFIC TO THIS CASE

42.     The Plaintiff was a subsidiary of Ardent Health Services LLC that operated a Medicare-certified LTCH located in Tulsa, Oklahoma during the years at issue.  The adjustments at issue were made by the fiscal intermediary, WPS.

43.     The adjustments at issue relate to bad debt amounts the Plaintiff claimed on its FY 2007 and FY 2008 cost reports for patients that were dually eligible for both Medicare and

Medicaid on their dates of service (*i.e.*, "dual eligibles").[1] All of these dual eligibles are obligated to pay Medicare coinsurance and deductible (referred to as "cost-sharing") amounts. The Plaintiff incurred bad debts in the form of unpaid Medicare cost-sharing amounts as a result of providing health care services to dual eligibles.

44.     It is undisputed that, at the time the services were provided to dual eligibles, the Plaintiff did not participate in the two state Medicaid programs at issue—Oklahoma and Kansas. Because state Medicaid programs do not allow non-Medicaid-participating providers to submit bills, and thus will not issue RAs showing processed bills to non-Medicaid-participating providers, the Plaintiff was not able to bill and receive RAs from the states.  Moreover, at the relevant times, the laws, regulations, and practices of Oklahoma did not permit LTCHs to enroll as Medicaid providers.  With the exception of a single beneficiary with Kansas Medicaid coverage that was discharged during Plaintiff's FY 2008 cost reporting period, all of the bad debts at issue here pertain to patients dually eligible for Medicare and Oklahoma Medicaid.

45.     Prior to December 2008, the fiscal intermediary did not require Plaintiff's hospital to bill the state Medicaid program for Medicare cost-sharing amounts and obtain an RA from the state in order to be reimbursed for the bad debt by Medicare because the hospital did not participate in Medicaid.  The Plaintiff was exempted from the must bill policy.

46.     In fact, prior instructions published by CMS for filling out form HCFA-339 (Provider Cost Report Reimbursement Questionnaire) provided that, where the provider could

---

[1] Dual eligibles are individuals who are entitled to Medicare Part A and/or Part B and are eligible for some form of Medicaid benefit.  There are different classes of dual eligibles (for example, Qualified Medicare Beneficiaries ("QMBs") qualify for Medicaid coverage of Medicare cost-sharing amounts but are not entitled to full Medicaid benefits); however, all of the dual eligibles at issue were eligible for some Medicaid coverage of their Medicare cost-sharing amounts.  All dual eligibles, including QMBs, will therefore be referred to herein as "dual eligibles."

establish that Medicaid has no responsibility for payment, it could simply furnish documentation of Medicaid eligibility as proof of the non-payment that would have resulted from billing.

47.     The fiscal intermediary settled cost reports prior to FY 2007 on this basis.  The fiscal intermediary sometimes proposed an adjustment to dual eligible bad debt, but would not finalize that adjustment after the Plaintiff furnished proof of Medicaid eligibility for the dual eligible beneficiaries.  This was documented in correspondence between the Plaintiff and the fiscal intermediary.  Medicare reimbursed the dual eligible bad debts based upon the Medicare beneficiaries' eligibility for Medicaid, and therefore indigence, without proof of billing the state or receiving Medicaid RAs.

48.     However, in December 2008, the fiscal intermediary abruptly changed its audit treatment of the Plaintiff's dual eligible bad debts and denied all dual eligible bad debts without Medicaid RAs.  Citing the Medicare bad debt "must bill" requirement, the fiscal intermediary insisted that the requirement applies equally to both Medicaid-participating and non-participating hospitals.  The Plaintiff was first notified of this change when it received an email from the fiscal intermediary in November 2008 about the payment adjustment that would appear on its NPRs in December 2008.

49.     Prior to November 2008, the Plaintiff received no advanced written notice of the policy change and thus had no opportunity to alter its cost reporting practice with regard to its dual eligible bad debts.  Significantly, no official public notice was *ever* issued by CMS that specifies the must bill policy applies to Medicare providers who do not participate in Medicaid.

50.     After November 2008, the fiscal intermediary denied dual eligible bad debts for the FY 2007 and 2008 cost reports at issue in this case under the must bill policy.

51.     The Plaintiff challenged the NPR adjustments denying Medicare reimbursement for its dual eligible bad debts by filing timely individual appeals with the PRRB for each cost report.  There are a total of two individual appeals.  While these appeals were filed separately, per the regulations and PRRB instructions, the Plaintiff was granted approval by the PRRB to have one hearing and consolidated briefs.  The total amount in controversy in the FY 2007 and 2008 appeals is approximately $568,803.

## DECISION OF THE PROVIDER REIMBURSEMENT REVIEW BOARD

52.      At the administrative level, the issue before the PRRB was whether the CMS must bill policy applies to the Plaintiff's dual-eligible bad debts when the Plaintiff did not participate in Medicaid.

53.     After a hearing held on November 3, 2015, the PRRB issued a decision regarding the FY 2007 and 2008 appeals on November 6, 2017 that was mostly favorable to the Plaintiff. The PRRB reversed the fiscal intermediary's dual eligible bad debt adjustments related to bad debt claims for in-state Oklahoma Medicaid beneficiaries, and remanded those claims back to the fiscal intermediary to determine the appropriate amount of bad debt reimbursement.  However, the PRRB affirmed the fiscal intermediary's dual eligible bad debt adjustment related to the one out-of-state Kansas Medicaid beneficiary.

54.     The PRRB determined that Oklahoma did not allow the Plaintiff to enroll in the Oklahoma Medicaid program and the Oklahoma Medicaid program only covered LTCH services provided to children at a children's hospital.  The PRRB found that this "is similar to the two exceptions to the 'must bill' policy that the Secretary recognized in a brief that he filed in *Community Hosp. of Monterey Peninsula v. Thompson*, Case No. C-01-0142 (N.D. Cal. Oct. 11, 2001)." **Exhibit B** at 8 (referring to *Community Hospital of Monterey Peninsula v. Thompson*,

323 F.3d 782 (9th Cir. 2003)).  The PRRB therefore concluded that an exception to the must bill

policy applies to the Plaintiff because the Plaintiff cannot obtain Medicaid RAs from the

Oklahoma Medicaid program.  The PRRB then agreed with this Court, stating that this Plaintiff

is caught in a Catch-22 which prevents its ability to comply with the must bill policy:

> In further support of this conclusion, the Board notes that Hillcrest clearly was
> caught in the same "Catch-22" described by the D.C. District Court in *Cove*.  Like
> the LTCHs in *Cove*, Hillcrest was unable to enroll in the local Medicaid program
> and, accordingly, could not bill the program and obtain Medicaid RAs in
> compliance with Medicare's "must bill" policy.  As the *Cove* Court stated, in
> these situations providers "are left in the untenable position of either refusing to
> treat dual-eligible patients or absorbing the bad debts associated with those
> patients."

**Exhibit B** at 8-9 (internal footnotes omitted).

55.     The PRRB found that the exceptions to the must bill policy described in the

Secretary's brief filed in the *Community Hospital of Monterey Peninsula* case reflected the

Secretary's policy because the Secretary's description of the exceptions did not include any

qualification and did not refer to any settlement agreement.  The PRRB also rejected any

assertion that it should be the provider's obligation to take legal action against any state that does

not issue Medicaid RAs:

> However, the Board is not convinced that requiring an individual provider to take
> legal action against its State is a viable means for the provider to obtain Medicare
> bad debt reimbursement.  Rather, the Board highlights the concession of the
> agency's counsel in *Cove*, stating that "it is in a better position than the providers
> to ensure that the state comply with the applicable regulations of the Medicare
> program."  The *Cove* Court was "not willing to place a stamp of judicial approval
> on a policy that would put non-participating providers in the position of not being
> paid due to the delinquency of federally-funded state programs."

**Exhibit B** at 9-10 (internal footnotes omitted).

56.     Finally, the PRRB found that there was evidence in the record that the fiscal

intermediary exempted the Plaintiff from the must bill policy until December 2008.  Prior to that

date, the fiscal intermediary allowed the Plaintiff to claim dual eligible bad debts with proof of

the beneficiary's Medicaid eligibility.  The PRRB therefore concluded:

> Given the unique circumstances of this case, the Board finds that an exception to
> the "must bill" policy should be applied to Hillcrest for claims that could not be
> billed to Oklahoma Medicaid.  Further, regardless of the application of the
> exception in this case, the Board concludes that Hillcrest's bad debts were
> uncollectible when claimed as worthless and that sound business judgment
> established that there was no likelihood of recovery at any time in the future.
> Hillcrest's Oklahoma bad debt claims have met the requirements of the
> regulation, 42 C.F.R. § 413.89(e).

**Exhibit B** at 10.

57.     With respect to the one out-of-state beneficiary from Kansas, however, the PRRB

determined that the Plaintiff could have enrolled in the Kansas Medicaid program but made a

"discretionary business decision" not to do so.  The PRRB acknowledged the Plaintiff's

contention that the fiscal intermediary's prior audit treatment did not require the Plaintiff to bill

the Kansas Medicaid program.  Yet, the PRRB stated that PRM-I §§ 310 and 322 do not allow

Medicare payment of Medicare coinsurance and deductibles as bad debts if the Medicaid state

plan provides for payment in whole or in part.

## DECISION OF THE CMS ADMINISTRATOR

58.     On behalf of the Defendant, the CMS Administrator decision dated January 8,

2018 (the "Administrator Decision" or the "Decision") on the FY 2007 and 2008 appeals,

modified the PRRB decision to reverse the portion of the decision that reversed the adjustments

to Oklahoma dual eligible bad debts, where the Medicaid program would not enroll LTCHs

providing services to adults, and affirmed the portion of the PRRB decision that upheld the fiscal

intermediary's application of the must bill policy to deny the Plaintiff's Kansas Medicaid dual

eligible bad debt.  *See generally* **Exhibit A**.

59.     The Administrator stated that, under Section 322 of the PRM, the amount that can be claimed as bad debt "is the amount the State 'does not pay' which presumes that the State has been billed and the State had rendered a determination on such a claim."  **Exhibit A** at 15. Therefore, the Administrator found that, where a state is liable for Medicare cost-sharing amounts, the provider must bill the state.  *See* **Exhibit A** at 21.

60.     The Administrator Decision states that the must bill policy is consistent with the Medicare statute and regulations.  *See* **Exhibit A** at 22.  The Administrator asserted that, "[e]ven in cases where the provider has calculated that the State has no liability for outstanding deductible and coinsurance amounts, the provider must bill the State and receive a remittance advice before claiming a bad debt as worthless . . . ."  **Exhibit A** at 24.

61.     The Administrator Decision states that the Plaintiff did not meet the requirements for Medicare-allowable bad debts because it chose not to enroll in Medicaid, did not bill the states, or the states did not issue RAs.  *See* **Exhibit A** at 25.  With respect to the one dual eligible bad debt for the Kansas Medicaid patient, the Administrator's Decision asserts that the Plaintiff did not obtain an RA because the Plaintiff chose not to enroll in Kansas Medicaid, not because it was relying on something CMS did.  *See* **Exhibit A** at 25.  The Administrator Decision states that the fact that a provider is not enrolled in Medicaid does not change the must bill requirement.  *See* **Exhibit A** at 25.

62.     The Administrator Decision states that this situation does not place the provider in a Catch-22 because the State is obligated to process Medicaid claims for dual eligible cost-sharing and a provider can sue the State to force the State to issue Medicaid RAs.  *See* **Exhibit A** at 26-27.

63. The Administrator Decision states that any bad debts that were allowed in the past do not establish agency policy; fiscal intermediaries (or MACs) do not review every item on every cost report each year. *See* **Exhibit A** at 27.

64. The Administrator Decision states that the exceptions in the agency's brief in the 9th Circuit *Monterey* case do not create exceptions to the must bill policy that apply to non-Medicaid-participating LTCHs. *See* **Exhibit A** at 28-29.

## THE CMS ADMINISTRATOR'S DECISION IS INVALID AND SHOULD BE REVERSED

65. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 64 above as if fully stated herein.

66. The CMS Administrator's modification of the PRRB's decision is reviewable by this Court pursuant to the provisions of the Medicare Act, 42 U.S.C. § 1395oo(f), and the APA, 5 U.S.C. § 706. The CMS Administrator's Decision is inconsistent with and unauthorized by the governing Medicare statute, regulations and manual provisions, is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, is unsupported by substantial evidence, and violates the APA and Medicare program's notice and comment rulemaking requirements, for the following reasons, among others:

a. The CMS Administrator's new interpretation or enforcement of the must bill policy, which beginning in December 2008 suddenly required Plaintiff's non-Medicaid-participating provider to bill states for dual eligible Medicare cost sharing amounts and obtain Medicaid RAs prior to submitting those costs for payment by Medicare as bad debt claims, was arbitrary, capricious and an abuse of discretion under the APA, 5 U.S.C. § 706(2)(A) and unsupported by substantial evidence pursuant to the APA, 5 U.S.C. § 706(2)(E).

b.      The CMS Administrator's Decision that requires Plaintiff to bill the state Medicaid program and obtain Medicaid RAs in order to demonstrate its reasonable collection efforts for Medicare bad debts reimbursement is arbitrary and capricious since Plaintiff could not participate in the Oklahoma Medicaid program and Plaintiff did not participate in the Kansas Medicaid program.  There was no mechanism for the Oklahoma and Kansas Medicaid programs to process Plaintiff's bills and issue Medicaid RAs.

c.      The CMS Administrator's Decision incorrectly characterized the Plaintiff's inability to comply with the new must bill policy or change in enforcement of that policy, which placed them in a "classic Catch-22" because, as a non-Medicaid-participating provider, the state Medicaid programs will not issue RAs in a form that CMS will accept and the Plaintiff was not enrolled in the Kansas Medicaid program and could not enroll in Oklahoma Medicaid because, as a LTCH, Plaintiff was not a recognized Medicaid provider type.  The Plaintiff's primary purpose is to provide necessary medical care to extremely sick patients, and based on a strained and misguided interpretation of the regulations, CMS has forced the Plaintiff to absorb costs for necessary care to a subset of indigent beneficiaries.

d.      The CMS Administrator's enforcement of the must bill policy to Plaintiff's dual eligible bad debt claims was a "[s]udden and unexpected change or change that does not take account of legitimate reliance on prior interpretation" and therefore is arbitrary, capricious or an abuse of discretion.  *Smiley v. Citibank*, 517 U.S. 735, 742 (1996).

e.      The CMS Administrator retroactively applied the must bill policy to Plaintiff without prior notice and is therefore arbitrary and capricious.  Contrary to the

treatment of Plaintiff's dual eligible bad debts in prior cost reporting periods, the fiscal intermediary abruptly began applying the must bill policy when auditing the Plaintiff's FY 2007 and 2008 cost reports.  CMS did not provide any notice to Plaintiff before this abrupt change, and CMS did not take into account the Plaintiff's legitimate reliance on the agency's longstanding practice of not applying the must bill policy to non-Medicaid-participating providers.

       f.       The CMS Administrator's Decision is arbitrary and capricious because it is an unexplained departure from CMS' prior treatment of Plaintiff's dual eligible bad debts before December 2008.

       g.       The evidence in this case established that the Plaintiff did, in fact, meet all Medicare statutory and regulatory requirements, and follow the manual provisions for reimbursements of dual eligible bad debt claims, and the Administrator erred in finding to the contrary.

       h.       The CMS Administrator's Decision erroneously held that the must bill policy is applicable to bad debt claims of non-Medicaid-participating providers despite the fact that no Medicare statute, regulation or manual provision requires that the Plaintiff enroll in Medicaid or bill the states and obtain an RA prior to submitting its bad debt claims.

       i.       The CMS Administrator's Decision is not in accordance with the rule that Medicaid participation is voluntary and is not a prerequisite to receiving Medicare reimbursement.

       j.       The CMS Administrator's Decision finds that the must bill policy applies without exception to the Plaintiff, yet the Decision acknowledges that CMS makes two

exceptions to the must bill policy for IMDs and CMHCs, but erroneously concludes that the rationale behind the exceptions does not apply to Plaintiff in this case.

k. The CMS Administrator's Decision is arbitrary and capricious because the CMS must bill policy requires providers to enroll in every state Medicaid program in the country. LTCHs frequently treat out-of-state beneficiaries. To ensure that Medicare will reimburse all dual eligible bad debts, including bad debts from out-of-state Medicaid beneficiaries, a provider would need to enroll in every state Medicaid program to comply with the must bill policy.

l. The CMS Administrator's Decision constitutes a new substantive rule for which CMS failed to comply with notice and comment rulemaking procedures required by the APA, 5 U.S.C. § 553, and the Medicare Act, 42 U.S.C. § 1395hh(a),(b).

m. Even if the CMS Administrator's Decision is an interpretive rule, the Decision still fails to comply with the reasonableness test of the arbitrary and capricious standard under § 706(2)(A) of the APA because CMS abruptly changed the must bill policy and did not take into consideration Plaintiff's legitimate reliance on the previous policy, which exempted Plaintiff's dual eligible bad debt claims because Plaintiff was not enrolled in Medicaid. In addition, even as an interpretive rule, CMS failed to comply with the notice and comment rulemaking procedures required by the Medicare Act, 42 U.S.C. § 1395hh(a)(2).

n. The CMS Administrator's Decision violates the cost-shifting prohibition under the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A)(i) and Medicare bad debt regulation, 42 C.F.R. § 413.89(d), by shifting the Medicare cost sharing amounts for dual eligibles to Plaintiff.

o.      The CMS Administrator's Decision violates the bad debt moratorium

under the Medicare Act, 42 U.S.C. § 1395f note, which prevents CMS from changing

policies, or requiring a provider to change policies, regarding bad debts that were in

effect as of August 1, 1987.

67.     CMS Administrator's Decision injured the Plaintiff in the amount of its denied

bad debt claims for dual eligible beneficiaries during the relevant periods, which total

approximately $568,803, before interest, fees and other costs.

**PRAYER FOR RELIEF**

**WHEREFORE, Plaintiff prays for judgment against Defendant as follows:**

68.     For an order reversing the CMS Administrator Decision in this case, and requiring

the Secretary to reimburse Plaintiff for the dual eligible bad debts for the cost reporting periods

at issue, which in the aggregate total approximately $568,803, before interest, fees and other

costs;

69.     That the Court award Plaintiff prejudgment interest to which it is entitled to as a

matter of right under 42 U.S.C. § 1395oo(f)(2);

70.     That the court award Plaintiff's costs and legal fees; and

71.     That the Court grant to Plaintiff such other and further relief that the Court deems

proper.

Dated: March 15, 2018

Respectfully submitted,

 /s/ *Jason M. Healy*
Jason M. Healy (D.C. Bar No. 468569)
THE LAW OFFICES OF
JASON M. HEALY PLLC
1701 Pennsylvania Ave., N.W.
Suite 300

Washington, DC 20006
(202) 706-7926
(888) 503-1585 (fax)
jhealy@healylawdc.com

*Attorney for Plaintiff*